**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| MARTIN DAVID HOYLE and B.E. TECHNOLOGY, L.L.C., <br><br>     Plaintiffs, <br><br>       v. <br><br> MICHELLE K. LEE, in her individual capacity as former Director of the U.S. Patent and Trademark Office; JAMES DONALD SMITH, in his individual capacity as former Chief Administrative Patent Judge of the Patent Trial and Appeal Board; JAMES T. MOORE, in his individual capacity as former Vice-Chief Administrative Patent Judge of the Patent Trial and Appeal Board; SALLY C. MEDLEY, KALYAN K. DESHPANDE, and LYNNE E. PETTIGREW, in their individual capacities as current or former Administrative Patent Judges of the Patent Trial and Appeal Board; and various other UNKNOWN OFFICERS, <br><br>     Defendants. | Case No. 2:21-cv-2512 <br><br> **JURY TRIAL REQUESTED** |

## COMPLAINT

Plaintiffs Martin David Hoyle ("Hoyle") and B.E. Technology, L.L.C. ("B.E. Technology"), by and through the undersigned counsel, make this Complaint against Defendants Michelle K. Lee, James Donald Smith, James T. Moore, Sally C. Medley, Kalyan K. Deshpande, Lynne E. Pettigrew, and various Unknown Officers, and hereby allege, based upon personal knowledge, belief, and relevant documents and information, as follows:

## NATURE OF THIS ACTION

1.      This is a civil rights action arising from the tortious and unconstitutional conduct of federal government officials at the United States Patent and Trademark Office ("USPTO"), in violation of Plaintiffs' rights under the Due Process Clause of the Fifth Amendment to the United States Constitution. U.S. CONST. amend. V.

2.      As explained herein, Plaintiffs are patent owners who were deprived of their valuable property rights in quasi-judicial administrative proceedings before the USPTO's Patent Trial and Appeal Board ("PTAB"). Several years later, Plaintiffs learned that these proceedings had been tainted by various improprieties and underhanded tactics, designed to stack the deck against them and in favor of their far more powerful opponents. In short, the system had been rigged all along, due to the unconstitutional actions of the Defendants named herein.

3.      Accordingly, Plaintiffs bring this action pursuant to *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and its progeny, to recover damages and other such appropriate relief for the violation of their due process rights under the Fifth Amendment and the resulting harm perpetrated by Defendants.

## PARTIES

### A.  Plaintiffs

4.      Martin David Hoyle is an individual inventor with a background in computer engineering, who has spent a significant portion of his career developing and patenting various web-based computer applications. Mr. Hoyle is also the founder and Chief Executive Officer ("CEO") of B.E. Technology.

5.      B.E. Technology is a limited liability company organized and existing under the laws of the State of Delaware, which, at all times relevant to the allegations herein had its principal place of business in Memphis, Tennessee.

**B. Defendants**

6.      Defendants are all current or former officers of the United States, as follows:

7.      Defendant Michelle K. Lee ("Lee") is the former Director of the USPTO. From 2003 until 2012, Ms. Lee was an executive at Google, Inc., where she held multiple positions including Head of Patents and Patent Strategy. In 2012, Ms. Lee left Google to become the Director of the USPTO's office in Silicon Valley. In 2014, Ms. Lee was appointed to the agency's top leadership position as Director of the USPTO—a position she held through June 2017. Upon information and belief, Ms. Lee is currently employed as an executive at Amazon and resides in San Francisco, California.

8.      Defendant James Donald Smith ("Smith") is the former Chief Administrative Patent Judge of the PTAB, a position he held from May 2011 through August 2015. Upon information and belief, Mr. Smith currently resides in St. Paul, Minnesota.

9.      Defendant James T. Moore ("Moore") is an Administrative Patent Judge who formerly served as Vice-Chief Administrative Patent Judge of the PTAB. Upon information and belief, Mr. Moore currently resides in the Washington, DC area.

10.      Defendant Sally C. Medley ("Medley") is an Administrative Patent Judge. Upon information and belief, Ms. Medley resides in Fairfax, Virginia.

11.      Defendant Lynne E. Pettigrew ("Pettigrew") is an Administrative Patent Judge. Upon information and belief, Ms. Medley resides in the Washington, DC area.

12.     Defendant Kalyan K. Deshpande ("Deshpande") is an Administrative Patent Judge. Upon information and belief, Mr. Deshpande resides in Arlington, Virginia.

13.     Defendants identified as the various other Unknown Officers are current and former officers, agents, employees, or other representatives of the United States, who are also legally responsible for the wrongs committed against Plaintiffs as described in this Complaint. When Plaintiffs become aware of the true identities of one or more of those Defendants, Plaintiffs will amend this Complaint accordingly, to add or substitute them as properly named Defendants.

14.     Pursuant to *Bivens*, all of the aforementioned Defendants are being sued in their individual capacities for personally undertaking, contributing to, and conspiring or otherwise being complicit in the actions that violated Plaintiffs' constitutional rights, under color of federal law, during their tenure as officers, agents, employees, or representatives of the United States. As a practical matter, however, it is well-documented that the government routinely indemnifies federal officers, agents, and employees from personal liability for claims arising from *Bivens* actions.[1]

## JURISDICTION AND VENUE

15.     This Court has jurisdiction under U.S. Const. Art. III § 2 because the rights sought to be vindicated herein are secured by the Fifth Amendment of the United States Constitution and give rise to a constitutional cause of action, as authorized by *Bivens* and its progeny. Jurisdiction is also proper pursuant to 28 U.S.C. § 1331 because the action presents substantial questions of federal law arising under the United States Constitution.

16.     Venue is proper under 28 U.S.C. § 1391(e)(1) because a substantial part of the property that is the subject of this action was situated in the Western District of Tennessee at all

---

[1] *See* James E. Pfander, Alexander A. Reinert, Joanna C. Schwartz, *The Myth of Personal Liability: Who Pays When Bivens Claims Succeed*, 72 STAN. L. REV. 561 (2020).

relevant times described herein, and because a substantial part of the events giving rise to the claim occurred within this judicial district.

## FACTUAL ALLEGATIONS

### A. Background

17.     Since at least 1997, Plaintiffs have been involved in the business of developing and patenting various web-based computer applications and related innovations.

18.     As background, Mr. Hoyle was working as a computer programmer in the mid-1990s when he observed that Americans were increasingly starting to use computers at home, in addition to the workplace—and needed to access their information regardless of which computer they were using. Mr. Hoyle set out to solve this problem when no one else was dedicating substantial resources to these issues, in part because the industry was primarily concerned with solving the network issue of providing faster internet access.

19.     Mr. Hoyle wanted to provide his products free-of-charge through advertising revenues and recognized that the internet presented both an opportunity and a technical challenge, in terms of collecting and implementing user-generated data to provide more personalized advertising products via web-based applications.

20.     In order to capitalize on his ideas, Mr. Hoyle formed B.E. Technology in August 1997—and then proceeded to obtain a total of 10 patents directed to these types of personalized web-based technologies, between 1998 and 2014.

**B. The '314 Patent and the '290 Patent**

21.     As is relevant here, Plaintiffs' patent portfolio includes U.S. Patent No. 6,628,314 ("the '314 patent") and U.S. Patent No. 6,771,290 ("the '290 patent").[2]

22.     The parent application that eventually led to the issuance of the '314 and '290 patents was originally filed on July 17, 1998. And the drawings, history, concepts, and claims presented in that patent application were subsequently made public on or around January 27, 2000.

23.     The '314 patent was issued on September 30, 2003, and is directed towards the technical implementation of gathering user-specific data for the purpose of delivering demographically appropriate, location-based, and contextually-targeted advertising products via various web-based applications.

24.     The '290 patent was issued on August 3, 2004, and is directed towards the technical implementation of certain user-centric personalization features for internet-based web browsers, including a toolbar providing the user with icons to access programs, files, and search. In return, and upon consent by the user, the toolbar gathered data that was used to deliver targeted advertising products via various web-based applications.

25.     Shortly thereafter, between late 2006 and 2007, the USPTO rejected several patent applications filed by Google on the grounds that the various targeted web-based advertising technologies described therein had already been patented in the '314 and '290 patents held by B.E. Technology. At the time, the Head of Patents and Patent Strategy at Google, was none other than Defendant Michelle Lee, who would go on to become the Director of the USPTO several years later.

---

[2] Mr. Hoyle is the inventor and B.E. Technology is the owner-by-assignment of the '290 and '314 patents.

26.     Rather than amending its applications in order to seek patent protection in a narrower or more distinct invention—as is customary upon receiving an initial rejection from the USPTO—Google simply abandoned all of its patent applications relating to targeted advertising claims that were already covered by the '314 and '290 patents held by B.E. Technology.

27.     The foundational importance of the '314 and '290 patents cannot be overstated. Indeed, the '314 patent has 1,187 citations and the '290 patent has 1,188 citations,[3] acknowledging these patents as "foundational patents" covering innovative targeted online advertising technologies that did not previously exist—and that were subsequently appropriated by various tech-industry giants to monetize their web-based products in the early 2000s.

## C.  The Patent Infringement Actions and Subsequent IPR Proceedings

28.     In or around January 2007, Mr. Hoyle became aware of the fact that Google, along with several other industry leading technology companies, had continuously implemented various targeted advertising technologies that directly infringed upon the '314 and '290 patents—without ever seeking to license, purchase, or otherwise acquire permission from B.E. Technology to utilize the inventions covered by those patents.

29.     On or around September 7, 2012, B.E. Technology filed patent infringement actions against several well-known technology companies—including Google, Facebook, Microsoft, Samsung, and others—to enforce its rights in the '314 and the '290 patents. *See, e.g.*, B.E.

---

[3] Citation analysis of patents has been routinely used for several decades to help assess patent quality and determine how patents impact the competition and affect the world at large. A greater number of forward citations for a given subject (published application or issued patent) may imply its importance in a given technical space, its monetary value, its potential for being infringed, or its shared interest by others in the technology space. Most patent professionals recognize that a raw count of the number of forward citations to a patent can be an indicator of a patent's value.

Technology, LLC v. Google Inc., W.D. Tenn. Case No. 2:12-cv-02830-JPM (filed Sept. 21, 2012).[4]

30.      Meanwhile, in 2012, Google spent a record $18 million on federal government lobbying efforts, much of which was directed towards intellectual property reform at the USPTO.

31.      Around the same time, the USPTO began to implement the Leahy–Smith America Invents Act of 2011 ("AIA"), 35 U.S.C. §§ 100 *et seq.*, which created an ostensibly more efficient adjudicative system for challenging the validity of existing patents through *inter partes* review ("IPR") proceedings.[5]

---

[4] *See also* B.E. Technology, LLC v. Amazon Digital Servs., Inc*.,* W.D. Tenn. Case No. 2:12-cv-02767-JPM (filed Sept. 7, 2012); B.E. Technology, LLC v. Facebook, Inc., W.D. Tenn. Case No. 2:12-cv-02769 (filed Sept. 7, 2012); B.E. Technology, LLC v. LinkedIn Corporation, W.D. Tenn. Case No. 2:12-cv-02772 (filed Sept. 7, 2012); B.E. Technology, LLC v. Groupon, Inc., W.D. Tenn. Case No. 2:12-cv-02781 (filed Sept. 10, 2012); B.E. Technology, LLC v. Pandora Media, Inc., W.D. Tenn. Case No. 2:12-cv-02782 (filed Sept. 10, 2012); B.E. Technology, LLC v. Twitter, Inc., W.D. Tenn. Case No. 2:12-cv-02783 (filed Sept. 10, 2012); B.E. Technology, LLC v. Barnes & Noble, Inc., W.D. Tenn. Case No. 2:12-cv-02823 (filed Sept. 21, 2012); B.E. Technology, LLC v. Microsoft Corporation, W.D. Tenn. Case No. 2:12-cv-02829 (filed Sept. 21, 2012); B.E. Technology, LLC v. Samsung Electronics America, Inc., W.D. Tenn. Case No. 2:12-cv-02825 (filed Sept. 21, 2012); B.E. Technology, LLC v. Samsung Telecommunications America, LLC, W.D. Tenn. Case No. 2:12-cv-02824 (filed Sept. 21, 2012); B.E. Technology, LLC v. Sony Computer Entertainment America LLC, W.D. Tenn. Case No. 2:12-cv-02826 (filed Sept. 21, 2012); B.E. Technology, LLC v. Sony Electronics Inc., W.D. Tenn. Case No. 2:12-cv-02828 (filed Sept. 21, 2012); B.E. Technology, LLC v. Sony Mobile Communications (USA) Inc., W.D. Tenn. Case No. 2:12-cv-02827 (filed Sept. 21, 2012); B.E. Technology, LLC v. Apple Inc., W.D. Tenn. Case No. 2:12-cv-02831 (filed Sept. 22, 2012); B.E. Technology, LLC v. Match.com LLC, W.D. Tenn. Case No. 2:12-cv-02834 (filed Sept. 22, 2012); B.E. Technology, LLC v. People Media, Inc., W.D. Tenn. Case No. 2:12-cv-02833 (filed Sept. 22, 2012); B.E. Technology, LLC v. Spark Networks, Inc., W.D. Tenn. Case No. 2:12-cv-02832 (filed Sept. 22, 2012); B.E. Technology, LLC v. Motorola Mobility Holdings LLC, W.D. Tenn. Case No. 2:12-cv-02866 (filed Oct. 2, 2012).

[5] *See generally Cuozzo Speed Techs., LLC v. Lee*, 136 S. Ct. 2131, 2133, 2144 (2016) (explaining that IPR proceedings impose a less onerous burden of proof for challenging the validity of patents "by a preponderance of the evidence," as compared to federal district courts, where challengers must prove invalidity by "clear and convincing evidence."); *accord Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1371 (2018). Although not particularly relevant here, it should be noted that the PTAB also handles various other types of post-grant proceedings, as well as appeals stemming from the rejection of patent applications during the examination process.

32.     The AIA also created the Patent Trial and Appeal Board ("PTAB") for the purpose of adjudicating such proceedings. The PTAB is staffed by Administrative Patent Judges ("APJs") who are appointed by the Secretary of Commerce in consultation with the Director of the USPTO—and who are assigned to sit on three-member panels for the purpose of presiding over IPR proceedings.

33.     Under the AIA system, any party may file a petition seeking to "institute" IPR proceedings before the PTAB, in order to challenge the validity of an existing patent.[6] As a practical matter, however, the exorbitant filing fees associated with IPR proceedings generally mean that that vast majority of IPR petitions are filed by large, sophisticated, and deep-pocketed parties—such as tech-industry giants, like Google—against smaller independent inventors, like the Plaintiffs in this case.[7]

34.     Upon information and belief, Defendant Lee, who had previously served as Google's Head of Patents and joined USPTO leadership in 2012, played an instrumental role in the USPTO's implementation of the PTAB following the passage of the AIA.

35.     Seizing upon this opportunity to short-circuit the patent-infringement litigation, Google and all the other defendants in those actions filed petitions seeking to challenge the validity of the '314 and the '290 patents in IPR proceedings—and then moved to stay the district court proceedings until the PTAB had ruled upon the validity of the underlying patents. *See B.E. Tech., LLC v. Amazon Digital Servs., Inc.*, No. 2:12-cv-02767, 2013 WL 12158571, at *1 (W.D. Tenn.

---

[6] The Supreme Court's decision in *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1372 (2018), provides an excellent history and overview of the *inter partes* review system that was implemented pursuant to the AIA.

[7] *See generally* Josh Malone, PTAB Trials Disproportionately Harm Small Businesses, Law360 (January 29, 2021), https://www.law360.com/articles/1348182/ptab-trials-disproportionately-harm-small-businesses?copied=1.

Dec. 6, 2013) (J. McCalla) (granting defendants' motions to stay the patent infringement actions, pending the resolution of IPR proceedings before the PTAB).

36.     The PTAB conducted seven separate IPR proceedings concerning the validity of the '314 and the '290 patents, which were all assigned to the same three-judge panel comprised of APJs Sally C. Medley, Kalyan K. Deshpande, and Lynne E. Pettigrew. The panel proceeded to rule against B.E. Technology in each of those cases—ultimately invalidating both patents as either "anticipated by" and/or "obvious," in light of prior art.[8]

37.     B.E. Technology appealed each of those decisions to the U.S. Court of Appeals for the Federal Circuit,[9] which combined all the cases into two consolidated appeals (one for all decisions concerning the '314 patent, and another for all decisions concerning the '290 patents)— and then affirmed PTAB's reasoning in two subsequent unpublished decisions. *See B.E. Tech., LLC v. Sony Mobile Commc'ns (USA) Inc.*, 657 F. App'x 982 (Fed. Cir. 2016) (Lourie, Chen, and Stoll, JJ.) (affirming PTAB's finding that the '290 patent is invalid); *B.E. Tech., LLC v. Google, Inc.*, No. 2015-1827, 2016 WL 6803057 (Fed. Cir. Nov. 17, 2016) (Lourie, Chen, and Stoll, JJ.) (affirming PTAB's finding that the '314 patent is invalid).

---

[8] *See Facebook, Inc., Match.com LLC, People Media, Inc., & Google Inc. v. B.E. Tech., LLC*, No. IPR2014-00052, 2015 WL 1735098 (P.T.A.B. Mar. 31, 2015); *Google, Inc., Match.com LLC, & People Media, Inc. v. B.E. Tech., LLC*, No. IPR2014-00038, 2015 WL 1735099 (P.T.A.B. Mar. 31, 2015); *Microsoft Corp. & Google, Inc. v. B.E. Tech., LLC*, No. IPR2014-00039, 2015 WL 1735100 (P.T.A.B. Mar. 31, 2015); *Sony Mobile Commc'ns (USA) Inc. v. B.E. Tech., LLC*, No. IPR2014-00029, 2015 WL 1570821 (P.T.A.B. Apr. 6, 2015); *Google, Inc. v. B.E. Tech., LLC*, No. IPR2014-00031, 2015 WL 1570822 (P.T.A.B. Apr. 6, 2015); *Microsoft Corp. v. B.E. Tech., LLC*, No. IPR2014-00040, 2015 WL 1570824 (P.T.A.B. Apr. 6, 2015); *Samsung Elecs. Am., Inc. v. B.E. Tech., LLC*, No. IPR2014-00044, 2015 WL 1570825 (P.T.A.B. Apr. 6, 2015).

[9] Pursuant to 35 U.S.C. § 319, all appeals from PTAB decisions are heard by the U.S. Court of Appeals for the Federal Circuit.

38.     Based upon the limited facts known by B.E. Technology and its counsel at that time, B.E. Technology did not file petitions for a writ of certiorari to the Supreme Court in either case.

### D.  Newly Discovered Evidence Reveals Due Process Violations in Plaintiffs' IPR Proceedings Before the PTAB

39.     Starting in or around late 2017, various news outlets, blogs, and other websites began to publish scandalous revelations about the USPTO's inner machinations, which raised serious questions about the constitutionality of IPR proceedings before the PTAB.

40.     For example, in August 2017, a government attorney for the USPTO admitted that the agency's leadership routinely engaged in the practice of "stacking" PTAB panels with specific APJs, to ensure that PTAB decisions in IPR proceedings would comport with various unwritten policy objectives, which were not shared with the parties in these proceedings.[10]

41.     Although this revelation was shocking news to many observers at the time, the USPTO eventually admitted that the Director and Chief Administrative Patent Judge had routinely employed various mechanisms "to indirectly influence" the course of IPR proceedings before the PTAB—such as by "designat[ing] [certain] APJs [that were presumably] predisposed to decide a case in his preferred manner." *United States v. Arthrex, Inc.*, No. 19-1434, 141 S.Ct. 1970, 2021 WL 2519433 (U.S. June 21, 2021)[11]

---

[10] *See* Gene Quinn, *USPTO Admits to Stacking PTAB Panels to Achieve Desired Outcomes*, IPWATCHDOG.COM (Aug. 23, 2017), https://www.ipwatchdog.com/2017/08/23/uspto-admits-stacking-ptab-panels-achieve-desired-outcomes/id=87206/ (referring to statements made by an attorney representing the USPTO during oral arguments in a case before the U.S. Court of Appeals for the Federal Circuit).

[11] *See also, e.g.*, *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1381 (2018) (Gorsuch, J., dissenting) (commenting upon the questionable implications of allowing the Director to assign specific APJs to certain cases and characterizing such practices as a problematic "retreat from the promise of judicial independence.").

42.     In a more recent publication, University of Texas Law Professor John M. Golden further observed that: "[w]ithout a statutory mechanism for central review of PTAB judgments, the …[USPTO] Director and … the Chief Judge of the PTAB … [had] sought to reverse disfavored PTAB judgments by convening expanded panels of PTAB judges personally selected by the Director or Chief Judge to consider a request for rehearing—a practice commonly characterized as 'panel stacking.'" *PTO Panel Stacking: Unblessed by the Federal Circuit and Likely Unlawful*, 104 Iowa L. Rev. 2447 (2019).

43.     Thereafter, in or around mid-2020, various news outlets, blogs, and other websites began to publish even more troubling revelations about the details of what appeared to be a highly improper compensation structure for APJs appointed to the PTAB—which included a performance-based bonus component that accounted for a significant portion of APJs' total annual compensation.

44.     Specifically, Plaintiffs learned that while APJs' base salaries are supposed to be subject to a statutory cap,[12] the USPTO had implemented a scheme of annual bonus payments, premised upon a points-based system of "decisional units" associated with the various types of work assignments that APJs undertake and complete within each calendar year—alongside various other subjective criteria, such as the "quality" of APJs' written opinions, their interactions with stakeholders, and their level of support for the PTAB's mission and leadership.[13]

---

[12] *See* 35 U.S.C. § 3(b)(6) ("The Director may fix the rate of basic pay for [APJs] … at [a rate] not greater than the rate of basic pay payable for level III of the Executive Schedule").

[13] Although it is not entirely clear when or where these details about APJs' compensation structure first began to emerge, most of these revelations seem to have originated, at least in part, with documents that were produced by the USPTO in response to a FOIA request filed by US Inventor. *See* Document compilation produced in response to FOIA Request No. F-19-00277, at https://usinventor.org/wp-content/uploads/2020/05/FOIA-F-19-00277-2019-11-04-APJ-PAPS.pdf.

45.     By all accounts, this compensation structure—which might otherwise pass muster in some quasi-adjudicative contexts—created particularly problematic incentives in the context of IPR proceedings, which generate a substantial amount of revenue for the USPTO's operating budget.[14]

46.     Importantly, the IPR process begins with the filing of a petition seeking to institute proceedings, which APJs must decide upon in the first instance—based, in part, on the likelihood that the petitioner could prevail in demonstrating the invalidity of the subject patent.

47.     And while legislative history of the AIA suggests that Congress intended to elevate the threshold for challenging the validity of existing patents in IPR proceedings, the compensation structure that was subsequently implemented by the USPTO provides substantial incentives for APJs to grant institution—irrespective of the underlying merits in any particular case.

48.     Simply put, the inextricable link between an APJ's discretionary authority to institute IPR proceedings, and the substantial amount of revenue that those proceedings generate for the agency, gives rise to an impermissibly strong inducement favoring institution, when combined with various financial incentives for APJs to conform their decisions to the agency leadership's policy preferences and mission.

49.     As explained in several recent cases before the U.S. Court of Appeals for the Federal Circuit, the resulting structural bias towards favoring the institution of IPR proceedings is

---

*See also, e.g.*, Matthew Bultman and Ian Lopez, *Big Bonuses for Patent Appeals Judges Raise Fairness Questions*, BLOOMBERG LAW (Sept. 8, 2020), https://bnanews.bna.com/ip-law/big-bonuses-for-patent-appeals-judges-raise-fairness-questions; Press Release: Congressmen Issa, Johnson Call on GAO to Investigate PTAB Decision-Making Practices (June 2, 2021), https://issa.house.gov/media/press-releases/congressmen-issa-johnson-call-gao-investigate-ptab-decision-making-practices; Britain Eakin, *Lawmakers Seek Probe Of USPTO Director's Sway Over PTAB*, LAW360 (Jun. 3, 2021), https://law360.com/articles/1390697/lawmakers-seek-probe-of-uspto-director-s-sway-over-ptab.

[14] The USPTO collects approximately $42,000 in filing fees alone for each IPR proceeding that it institutes.

itself sufficient to constitute a violation of patent owners' rights under the Due Process Clause of the Fifth Amendment.[15]

50.     As it turns out, however, this institutional inducement for APJs to grant IPR petitions in the first instance was just the tip of the iceberg.

51.     In addition to undermining APJs' judicial independence at the institution stage of IPR proceedings, subsequent news articles (based upon documents obtained through a FOIA request) revealed that USPTO leadership had been effectively manipulating the "performance-based" components of this compensation structure to control and coerce specific adjudicative outcomes by implementing policies that expressly discouraged and penalized the issuance of dissenting opinions.

52.     For example, in an internal email communication addressed to all APJs, Defendant Moore declared that dissenting and concurring opinions "are not normally efficient mechanisms for securing the 'just, speedy, and inexpensive' resolution" of PTAB cases, and would therefore no longer be counted towards APJs' "productivity goals," absent specific exceptions.[16]

---

[15] Several recent cases before U.S. Court of Appeals for the Federal Circuit have argued that these circumstances violate patent owners' due process rights in IPR proceedings. *See e.g.,* Appellants' Brief, *New Vision Gaming & Dev., Inc. v. SG Gaming, Inc.*, Case No. 2020-1399 (Dkt. 29), at 29-51 (Fed. Cir. June 30, 2020) (citing *Tumey v. Ohio*, 273 U.S. 510, 532 (1927)); *see also* Appellants' Brief, *Mobility Workx, LLC v. Unified Patents, LLC*, Case No. 2020-1441 (Dkt. 21), at 25-48 (same). And while some members of the Federal Circuit panel seemed persuaded by the appellants' presentation at oral argument, the court has since ordered the parties to submit further briefing in order to decide whether such cases should be remanded on other grounds, in light of the Supreme Court's recent decision in *United States v. Arthrex, Inc.,* No. 19-1434, 2021 WL 2519433 (U.S. June 21, 2021). Thus, it appears unlikely that the Federal Circuit will ultimately pass upon the merits of the constitutional arguments raised by appellants in these cases.

[16] *See* Gene Quinn, *Structural Bias at the PTAB: No Dissent Desired*, IPWATCHDOG.COM (Jun. 6, 2018), https://www.ipwatchdog.com/2018/06/06/structural-bias-ptab-no-dissent-desired/id=94507/.

53.     Due to this policy directive against the issuance of dissenting and concurring opinions by APJs, approximately 98% of the merits-based decisions that had been issued by the PTAB as of 2017 were unanimous.[17]

54.     Thus, while the PTAB was designed by Congress to provide fair and meaningful administrative adjudications of patent owners' rights before three-judge panels comprised of independent and impartial APJs, the reality was that practically all of these cases were being decided by a single APJ, often hand-selected by the Director of the USPTO in order to achieve a specific pre-determined outcome, regardless of any evidence presented at trial, with the other two APJs merely rubber-stamping the final decision.

55.     Moreover, the Director of the USPTO at all times relevant to the IPR proceedings discussed herein, was none other than Defendant Lee—who had previously served as the Head of Patents and Patent Strategy at Google (*i.e.*, one of the petitioners in the IPR proceedings) prior to assuming the role of Director. Defendant Lee also went on to become an executive at Amazon (another petitioner in the IPR proceedings at issue), following her stint at the USPTO.

56.     Upon learning about these facts, Mr. Hoyle began conducting his own research into the APJs who had presided over the IPR proceedings that resulted in the invalidation of the '314 and '290 patents back in 2015. As a result of his own independent research, Mr. Hoyle learned that all three of those APJs (Deshpande, Medley, and Pettigrew) were known to have a particularly high propensity towards ruling against patent owners in IPR proceedings as compared to other PTAB judges.

---

[17] *See* Scott McKeown, *Judicial Independence & The PTAB: The Tension Between Judicial Independence & Agency Consistency*, ROPES & GRAY (Dec. 12, 2017), https://www.patentspostgrant.com/judicial-independence-ptab/.

57.     Specifically, Mr. Hoyle discovered that, as of 2015, APJ Medley had presided over approximately 64 IPR proceedings and had ruled in favor of the petitioners by cancelling the challenged patents in 100% of those proceedings. APJ Deshpande had likewise cancelled the challenged patents in 100% of the IPR proceedings over which he had presided as of 2015. And APJ Pettigrew also had a solid cancellation rate of 97% in all of the IPR proceedings over which she had presided as of 2015.

58.     Upon information and belief, USPTO leadership was well-aware of these three APJs' particular propensity for ruling against patent owners, and specifically chose them (out of approximately 215 APJs who were employed by the USPTO at the time) to preside over B.E. Technology's IPR proceedings for that reason.

59.     Mr. Hoyle also learned that all three of the APJs assigned to B.E. Technology's IPR proceedings received substantial bonus payments that year. Specifically, APJ Deshpande (who authored the four final written decisions cancelling the '314 patent in 2015) received a bonus payment in the amount of $25,220 that year; APJ Pettigrew (who authored the three final written decisions invalidating the '290 patent in 2015) received a bonus in the amount of $18,520 that year; and APJ Medley (who joined in each of those decisions) received a bonus in the amount of $25,976 that year.

60.     Thereafter, Mr. Hoyle discovered additional facts tending to suggest that USPTO leadership had specifically targeted B.E. Technology for enhanced scrutiny and adverse actions during this time frame. Specifically, Mr. Hoyle learned that some of B.E. Technology's other patent applications (unrelated to the '314 and the '290 patents discussed herein) had been flagged for enhanced scrutiny pursuant to the USPTO's surreptitious Sensitive Application Warning

System ("SAWS") program—which operated in secret from 1994 until approximately 2014.[18] During that time, the USPTO consistently flagged applications filed by independent inventors that were perceived as potentially threatening to existing powerful firms and industries, and usually rejected those applications after substantial delay. The USPTO never informed patent applicants that their applications had been flagged under the SAWS program, so patent applicants had no way of challenging their SAWS status.[19]

61.     Although Plaintiffs did not know it at the time, the assistant patent examiner who had been assigned to the patent applications filed by B.E. Technology actually admitted, during a conversation with a private investigator in or around July 2020, that she had been instructed to flag all patent applications relating to targeted advertising technologies (including several filed by Plaintiffs around that time) for increased scrutiny under the SAWS program during her tenure at the USPTO.

62.     Mr. Hoyle found this revelation to be particularly troubling, considering that targeted advertising comprised almost all of Google's gross revenues around that time—and that Google's former Head of Patent Strategy (Defendant Lee) was serving as USPTO Director when the decision was made to flag all targeted advertising technologies for increased scrutiny under the SAWS program.

63.     Upon information and belief, Defendant Moore and various other Unknown Officers were also directly involved in implementing the SAWS program.

---

[18] *See* Ryan Davis*, USPTO Docs Shed Some Light on Secretive SAWS Program*, LAW360 (Jul. 24, 2018), https://www.law360.com/articles/1066110/uspto-docs-shed-some-light-on-secretive-saws-program.

[19] For a more comprehensive description of the SAWS program, see the district court's discussion of plaintiff's allegations in *Morinville v. United States Patent & Trademark Office*, 442 F. Supp. 3d 286, 289 (D.D.C. 2020) (alleging that SAWS program violated various provisions of the Privacy Act, 5 U.S.C. § 552a).

64.     Furthermore, Defendants Lee, Moore, and various other Unknown Officers knowingly concealed the existence of the SAWS program from the Office of the Inspector General for the U.S. Department of Commerce, during their tenure at the USPTO.

65.     And while the SAWS program obviously did not preclude the issuance of the '314 and the '290 patents, these revelations only served to confirm Plaintiffs' suspicions and concerns about the USPTO leadership's pervasive structural bias and secret internal policies favoring large industry players often referred to as "Big Tech" (*i.e.*, the agency's biggest customers[20]), and its corresponding animus towards independent inventors like Plaintiffs, at all times relevant to the allegations in this Complaint.[21]

66.     Several other more recent occurrences and revelations about the PTAB's inner machinations have further motivated Plaintiffs to file this suit.

67.     For example, on or about April 21, 2021, Mr. Hoyle was made aware of various statements made by former APJ James Carmichael during a webinar hosted by IPWatchdog.com, effectively acknowledging the existence of improper incentives for APJs to institute proceedings irrespective of the underlying merits in IPR petitions.

---

[20] As is relevant here, Google is one of the USPTO's most important customers in terms of the number of IPR petitions and patent applications that it has filed to date—and the substantial fees that it has thereby generated for the agency. In fact, publicly-available documents show that Google has filed a total of 396 IPR petitions—placing it in the number three spot for the greatest number of petitions filed to date, after only Samsung and Apple, who were also petitioners in the IPR proceedings discussed herein. *See* Top 20 Petitioners (PTAB Search: Analytics), UNIFIED PATENTS, https://portal.unifiedpatents.com/ptab/analytics/case-level/top-parties?sort=-filing_date (aggregating publicly-available data on PTAB cases from the USPTO). And because the USPTO is a "fee-funded" agency, there is a strong incentive to provide satisfactory results for those entities that generate the lion's share of its revenues.

[21] *See* Josh Malone, PTAB Trials Disproportionately Harm Small Businesses, LAW360 (January 29, 2021), https://www.law360.com/articles/1348182/ptab-trials-disproportionately-harm-small-businesses?copied=1.

68.     Upon information and belief, former APJ Carmichael stated something to the effect that there was "a structural incentive to get credit for writing final written decisions," during his time at the PTAB, and that "the only way to get those credits [was] … to institute" those proceedings in the first instance. "And once you've done the work of deciding whether to institute," he added, "it's a good deal from a credit perspective … to get to the final written decision."

69.     Thereafter, on or about July 5, 2021, Mr. Hoyle became aware of a paper that was published in draft form on the Social Science Research Network (SSRN), which revealed several additional troubling revelations about the inner machinations of the PTAB at the time of B.E. Technology's IPR proceedings. *See* Ron D. Katznelson, The Pecuniary Interests of PTAB Judges: Empirical Analysis Relating Bonus Awards to Decisions in AIA Trials (July 5, 2021), *available at* https://ssrn.com/abstract=3871108 [*hereinafter* "the Katznelson Report"].

70.     The Katznelson Report shed light on various other aspects of the incentive-based compensation program for APJs, which demonstrated that USPTO leadership had approached the PTAB like any other commercial enterprise—designed to maximize stakeholder interests—as opposed to an even-handed government adjudicative body. For example, the Katznelson Report identified a recruitment brochure published by the USPTO at a time when the agency needed to recruit additional APJs to handle the influx of IPR petitions, which advertised the availability of "gain-sharing bonuses" as a benefit available to PTAB judges—thereby suggesting that APJs would receive a share in the revenues that they generated for the agency by instituting IPR proceedings. *See* Katznelson Report at 6-7. The Katznelson Report also published a 2018 version of the PTAB's Performance Appraisal Plan for APJs that improperly described IPR petitioners as

"shareholders," and set out to reward APJs for their "business acumen," in achieving outcomes that maximize value to such shareholders. *Id*.

71.    The Katznelson Report also revealed—based upon documents obtained through FOIA requests—the existence of a secret internal review committee within the PTAB called the AIA Review Committee ("ARC"), which was apparently responsible for reviewing certain final written decision drafts prior to their issuance, and providing suggestive guidance and/or edits on such decisions—presumably for the purpose of ensuring that such decisions would reflect and conform with the unwritten policy objectives of USPTO leadership. *See* Katznelson Report at 13-14. And since the identity of persons serving on this secret extra-panel review committee was never revealed, Plaintiffs were ultimately deprived of their right to know who else might have contributed, influenced, or made the ultimate decision in B.E. Technology's IPR proceedings—or whether those persons (such as Defendant Lee) should have been disqualified from weighing in on the matter, due to clear conflicts-of-interest.

72.    Finally, the Katznelson Report offered a compelling analysis of IPR decisions and APJ bonuses issued during the 2016 fiscal year, which demonstrated the existence of a statistically significant correlation between APJ bonus payments and decisional outcomes that were adverse to patent holders. *See* Katznelson Report at 30 ("[I]n FY 2016, PTAB judges appeared to have earned an average bonus of $\beta_C = \$313.6$ per Final Written Decision when cancelling patent claims, but only an average of $\beta_U = \$2.4$ per Final Written Decision when upholding all patent claims"). Thus, the Katznelson Report further confirmed that the performance-based bonus component of the compensation structure for APJs had been implemented in a manner that effectively rewarded the cancellation of patent claims in IPR proceedings.

\*      \*      \*

73.     Each of the circumstances described above arguably constitutes an independent due process violation that would seriously undermine the constitutionality of B.E. Technology's IPR proceedings if presented alone.

74.     When taken together, however, the various factors surrounding B.E. Technology's IPR proceedings—*i.e.*, (1) the USPTO's practice of secretly stacking panels to achieve specific adjudicative outcomes; (2) the appearance of impropriety arising from petitioners' inside connections to USPTO leadership when the PTAB presided over B.E. Technology's IPR proceedings; (3) the improper financial incentives for APJs to institute IPR proceedings in the first place, as well as the correlation between APJ bonus payments and particular adjudicative outcomes that are adverse to patent owners; (4) the various other ways in which this compensation structure has enabled USPTO leadership to exert undue influence over the adjudicative process behind closed doors, with complete disregard for conflicts-of-interest that would almost certainly trigger recusal obligations in any other adjudicative context, and without any formal accountability mechanisms in place; and (5) the agency's demonstrated bias against independent inventors, as demonstrated by the SAWS program—amount to a particularly clear and egregious violation of Plaintiffs' rights and leave no room for debate as to the unconstitutionality of those proceedings.

*     *     *

75.     Moreover, the foregoing allegations demonstrate that each of the named Defendants herein was either individually responsible for, involved in, or otherwise complicit in the actions that resulted in the violation of Plaintiffs' constitutional rights.

76.     Specifically, upon information and belief, Defendants Lee, Smith, and Moore, together with various other Unknown Officers, improperly employed their case-assignment authority to staff APJ panels in a manner that would ensure that the PTAB's decision in the IPR

proceedings would result in the invalidation of the '314 and '290 patents—irrespective of the facts presented to the PTAB.

77.     Relatedly, Defendants Lee, Smith, and Moore, together with other various other Unknown Officers, were also personally responsible for implementing various USPTO policies concerning the compensation structure of APJs that provided improper incentives and inducements towards granting the petitioners' requests to institute the IPR proceedings in the first instance— and then employed that compensation structure as a mechanism for exerting further undue influence over the substantive outcome of those proceedings.

78.     Upon information and belief, Defendants Medley, Pettigrew, and Deshpande were aware of these pressures exerted upon them to institute proceedings and invalidate the '314 and '290 patents, and either conspired with, or were at the very least complicit, in the unconstitutional scheme to deprive Plaintiffs of their valuable property rights in these patents.

### E.  Subsequent Remedial Measures Implemented by the USPTO Fail to Provide Adequate Relief to Plaintiffs

79.     Upon information and belief, the USPTO has taken various remedial actions to address some, but not all, of the issues described above in recent years.

80.     For example, documents obtained pursuant to a FOIA request suggest that the compensation structure for APJs had been modified, as of 2019, by subjecting the performance-based bonus incentive to a cap of $10,000 per year. Upon information and belief, however, USPTO leadership has not yet retracted or revised its position that dissenting or concurring opinions shall not count towards APJs' productivity goals under the current compensation structure.

81.     The USPTO also claims to have discontinued its SAWS program—though it has not fully disclosed the extent to which that program served to improperly target and prejudice

certain patent applicants during its implementation and has not taken further remedial measures to provide any avenue of relief to those individuals and entities.

82.     And more recently, in response to the United States Supreme Court's decision and directives in *United States v. Arthrex, Inc.,* No. 19-1434, 141 S.Ct. 1970, 2021 WL 2519433 (U.S. June 21, 2021)¸ the USPTO is currently implementing a remedy to cure an inherent constitutional infirmity in the agency's prior implementation of the PTAB, which "blur[red] the lines of accountability demanded by the Appointments Clause and … [left] the parties with neither an impartial decision by a panel of experts nor a transparent decision for which a politically accountable officer must take responsibility." *Id.* at 1982.[22]

83.     And while it appears that the USPTO is undertaking certain necessary steps towards implementing a more just and equitable system for the adjudication of IPR proceedings before the PTAB, these corrective measures offer nothing in the way of relief or remedies to the Plaintiffs—who were deprived of valuable property rights after being forced to adjudicate the validity of their patents in a forum where the deck was improperly stacked against them, without their knowledge.

84.     Nor do the Plaintiffs have access to any other adequate remedies at law (aside from this *Bivens* action) for the unconstitutional deprivation of their property interest in the '314 and the '290 patents.

\*        \*        \*

85.     Furthermore, since the above-described facts about the inner machinations of the USPTO were not fully revealed or made publicly available until the present day, Plaintiffs never

---

[22] As the U.S. Supreme Court observed in *Arthrex,* the USPTO's flawed implementation of the PTAB authorized APJs to make final decisions without any formal procedural mechanism for oversight and review—and arguably gave rise to the unconstitutional scheme described herein, whereby agency leadership instead resorted to various informal and improper mechanisms "to indirectly influence" adjudicative outcomes in IPR proceedings. *Id.* at 1982.

had an opportunity to raise these issues and their constitutional implications—either in the IPR proceedings before the PTAB, or on direct appeal to the U.S. Court of Appeals for the Federal Circuit. Accordingly, Plaintiffs are entitled to the equitable tolling of any statutes of limitations that might otherwise apply to preclude their claims.

## COUNT 1

**Constitutional Violations of Plaintiffs' Rights Under
the Due Process Clause of the Fifth Amendment
(against all Defendants)**

86.     Plaintiffs incorporate by reference all of the allegations in the paragraphs above, as if fully set forth herein.

87.     The Due Process Clause of the Fifth Amendment to the United States Constitution provides that "[n]o person shall be … deprived of life, liberty, or property without due process, of law." U.S. CONST. amend. V.

88.     It is well-established that patent rights are "property" within the meaning of the Fifth Amendment.[23] Accordingly, any adjudicative forum or proceeding that decides upon the validity of a patent must necessarily comport with the most basic requirements of the Due Process Clause.

---

[23] The Supreme Court has repeatedly and unequivocally held that patents are property within the meaning of the Fifth Amendment. *See, e.g.*, *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1379 (2018) ("[O]ur decision [upholding the constitutionality of *inter partes* review under Article III] should not be misconstrued as suggesting that patents are not property for purposes of the Due Process Clause or the Takings Clause.") (citing *Florida Prepaid Postsecondary Ed. Expense Bd. v. College Savings* Bank, 527 U.S. 627, 642 (1999); *James v. Campbell*, 104 U.S. 356, 358 (1882)); *see also Consol. Fruit-Jar Co. v. Wright*, 94 U.S. 92, 96 (1877) ("A patent for an invention is as much property as a patent for land."); *Cammeyer v. Newton*, 94 U.S. 225, 226 (1876) ("the right of the [patent] holder is as much entitled to protection as any other property."); *Brown v. Duchesne*, 60 U.S. 183, 197 (1857) ("For, by the laws of the United States, the rights of a party under a patent are his private property."); *see also Celgene Corp. v. Peter*, 931 F.3d 1342, 1358 (Fed. Cir. 2019) ("The PTO does not dispute that a valid patent is private property for the purposes of the Takings Clause."), *cert. denied*, 141 S. Ct. 132 (2020).

89.     It is equally well-established that the right to due process means—among other things—that litigants are entitled to a fair adjudication before an impartial decisionmaker.[24]

90.     And it is also well-established that due process encompasses the right of any litigant to know the identity of the ultimate decision-makers in any adjudicative system that issues a final determination concerning rights that are otherwise protected and guaranteed by the Fifth Amendment.[25]

91.     The conduct herein surrounding the IPR proceedings, that led to the invalidation of the '314 and the '290 patents, clearly and unequivocally violated Plaintiffs' well-established rights under the Due Process Clause of the Fifth Amendment.

92.     And Plaintiffs were clearly injured by the unconstitutional deprivation of their valuable property interests in '314 and the '290 patents.

93.     The Supreme Court's seminal decision in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), gives rise to an implied cause of action against individual federal officers, agents, employees, or other representatives of the United States, for perpetrating violations of clearly established constitutional law. Further, in *Davis v. Passman*, 442 U.S. 228 (1979), the Supreme Court specifically recognized the availability of a *Bivens* action as a mechanism for vindicating the rights of litigants under the Fifth Amendment.

---

[24] *See, e.g.*, *Tumey v. Ohio*, 273 U.S. 510, 532 (1927); *In re Murchison*, 349 U.S. 133, 136 (1955); *Ward v. Monroeville,* 409 U.S. 57, 61–62 (1972); *Gibson v. Berryhill*, 411 U.S. 564 (1973); *Withrow v. Larkin*, 421 U.S. 35 (1975); *Mathews v. Eldridge*, 424 U.S. 319 (1976); *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 242 (1980); *Schweiker v. McClure*, 456 U.S. 188, 195 (1982); *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 824 (1986); *Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal.,* 508 U.S. 602, 617 (1993); *Weiss v. United States*, 510 U.S. 163, 178 (1994); *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004); *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009).

[25] *See e.g.*, *In re Oliver*, 333 U.S. 257, 268 (1948); *accord Levine v. U.S.*, 362 U.S. 610, 616 (1960); *Estes v. State of Tex.,* 381 U.S. 532, 539 (1965); *Sheppard v. Maxwell*, 384 U.S. 333, 349 (1966); *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 380-381 (1979); *U.S. v. Ochoa-Vasquez*, 428 F.3d 1015, 1029-1030 (11th Cir. 2005); *U.S. v. Index Newspapers LLC*, 766 F.3d 1072, 1084 (9th Cir. 2014).

94.     Pursuant to *Bivens* and its progeny, the Defendants named herein are personally liable for undertaking, contributing to, and conspiring or otherwise being complicit in the actions that violated Plaintiffs' constitutional rights, under color of federal law, during their tenure as officers, agents, employees, or representatives of the United States.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor awarding compensatory and punitive damages against the Defendants, in an amount to be proven at trial, together with an award of attorneys' fees, costs and expenses, pursuant to 28 U.S.C. § 2412(b) and 5 U.S.C. § 504 *et seq.*, and any other such relief as the Court deems just and equitable.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury as to all issues and causes of action stated herein.

Dated: August 9, 2021
        New York, NY

                              **POLLOCK COHEN LLP**

                              By:    s/ Agatha M. Cole
                                     Agatha M. Cole
                                     Attorney Bar Number NY5293881
                                     60 Broad Street, 24th Floor
                                     New York, NY 10004
                                     Email: agatha@pollockcohen.com
                                     Telephone: (212) 337-5361