# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| MARTIN DAVID HOYLE and B.E. TECHNOLOGY, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> MICHELLE K. LEE, JAMES DONALD SMITH, JAMES T. MOORE, SALLY C. MEDLEY, KALYAN K. DESHPANDE, LYNNE E. PETTIGREW, and UNKNOWN OFFICERS, <br><br> Defendants. | Case No. 2:21-cv-02512-JPM-tmp |

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

Before the Court is Defendants' Motion to Dismiss the Complaint and Memorandum of Law, filed on November 23, 2021. (ECF No. 19.) For the reasons discussed below, Defendants' Motion to Dismiss is **GRANTED**.

**I.     BACKGROUND**

    **a.  Procedural Background**

Plaintiffs filed their Complaint on August 9, 2021. (ECF No. 1.) Defendants filed this Motion to Dismiss on November 23, 2021. (ECF No. 19.) Plaintiffs filed a Response in Opposition on January 21, 2022. (ECF No. 22.) Defendants filed a Reply on February 11, 2022. (ECF No. 23.) On June 13, 2022, Defendants also filed a Notice of Supplemental Authority. (ECF No. 24.)

1

### b. Factual Background

Plaintiffs allege that the Defendants in this suit violated Plaintiffs' constitutional right to due process under the Fifth Amendment and seek compensatory and punitive damages against them pursuant to Bivens and its progeny. (ECF No. 1 ¶¶ 86–94.) Plaintiffs make the following factual allegations in their Complaint, which they contend amount to a procedural due process violation that can be remedied with a Bivens suit. Plaintiffs' patent portfolio includes two relevant patents to the issues here: U.S. Patent No. 6,628,314 (the "'314 Patent) and U.S. Patent No. 6,771,290 (the "'290 Patent). (Id. ¶ 21.) In September 2012, "B.E. Technology filed patent infringement actions against several well-known technology companies—including Google, Facebook, Microsoft, Samsung, and others—to enforce its rights in the '314 and the '290 patents." (Id. ¶ 29.) "Google and all other defendants in those actions filed petitions seeking to challenge the validity of the '314 and the '290 patents in IPR proceedings—and then moved to stay the district court proceedings until the PTAB had ruled upon the validity of the underlying patents." (Id. ¶ 35.) "The same three-judge panel—Sally C. Medley, Kalyan K. Deshpande, and Lynne E. Pettigrew" presided over all seven of the IPR proceedings related to these two patents, and this "panel proceeded to rule against B.E. Technology in each of those cases—ultimately invalidating both patents as either 'anticipated by' and/or 'obvious,' in light of prior art." (Id. ¶ 36.)

Following the panel's decisions, B.E. Technology appealed to the Federal Circuit, which "then affirmed [the] PTAB's reasoning in two subsequent unpublished decisions." (Id. ¶ 37.) "Based upon the limited facts known by B.E. Technology and its counsel at that time, B.E. Technology did not file petitions for a writ of certiorari to the Supreme Court in either case." (Id. ¶ 38.)

"Starting in or around late 2017, various news outlets, blogs, and other websites began to publish scandalous revelations about the USPTO's inner machinations, which raised serious questions about the constitutionality of IPR proceedings before the PTAB." (Id. ¶ 39.) "[T]he USPTO eventually admitted that the Director and Chief Administrative Patent Judge had routinely employed various mechanisms 'to indirectly influence' the course of IPR proceedings before the PTAB—such as by 'designat[ing] [certain] APJs [that were presumably] predisposed to decide a case in his preferred manner.'" (Id. ¶ 41.) (quoting United States v. Arthrex, Inc., 141 S. Ct. 1970, 1972 (2021).)

Additionally, "Plaintiffs learned that while APJs' base salaries are supposed to be subject to a statutory cap, the USPTO had implemented a scheme of annual bonus payments, premised upon a points-based system of 'decisional units' associated with the various types of work assignments that APJs undertake and complete within each calendar year" which "created particularly problematic incentives in the context of IPR proceedings." (Id. ¶¶ 44–45.) Specifically, "the compensation structure that was subsequently implemented by the USPTO provides substantial incentives for APJs to grant institution" and the USPTO implemented "policies that expressly discouraged and penalized the issuance of dissenting opinions." (Id. ¶¶ 47, 51.)

"[T]he Director of the USPTO at all times relevant to the IPR proceedings discussed herein, was . . . Defendant Lee—who had previously served as the Head of Patents and Patent Strategy at Google." (Id. ¶ 55.) Mr. Hoyle also discovered that:

> APJ Medley had presided over approximately 64 IPR proceedings and had ruled in favor of the petitioners by cancelling the challenged patents in 100% of those proceedings. APJ Deshpande had likewise cancelled the challenged patents in 100% of the IPR proceedings over which he had presided as of 2015. And APJ Pettigrew also had a solid cancellation rate of 97% in all of the IPR proceedings over which she had presided as of 2015.

3

>Upon information and belief, USPTO leadership was well-aware of these three APJs' particular propensity for ruling against patent owners, and specifically chose them (out of approximately 215 APJs who were employed by the USPTO at the time) to preside over B.E. Technology's IPR proceedings for that reason.
>
>Mr. Hoyle also learned that all three of the APJs assigned to B.E. Technology's IPR proceedings received substantial bonus payments that year. Specifically, APJ Deshpande (who authored the four final written decisions cancelling the '314 patent in 2015) received a bonus payment in the amount of $25,220 that year; APJ Pettigrew (who authored the three final written decisions invalidating the '290 patent in 2015) received a bonus in the amount of $18,520 that year; and APJ Medley (who joined in each of those decisions) received a bonus in the amount of $25,976 that year.

(Id. ¶ 57–59.)

"Thereafter, Mr. Hoyle discovered additional facts tending to suggest that USPTO leadership had specifically targeted B.E. Technology for enhanced scrutiny and adverse actions during this time frame." (Id. ¶ 60.) "Mr. Hoyle learned that some of B.E. Technology's other patent applications (unrelated to the '314 and the '290 patents discussed herein) had been flagged for enhanced scrutiny pursuant to the USPTO's surreptitious Sensitive Application Warning System ('SAWS') program—which operated in secret from 1994 until approximately 2014." (Id.) "Although Plaintiffs did not know it at the time, the assistant patent examiner who had been assigned to the patent applications filed by B.E. Technology actually admitted . . . that she had been instructed to flag all patent applications relating to targeted advertising technologies . . . for increased scrutiny under the SAWS program during her tenure at the USPTO." (Id. ¶ 61.) "[W]hile the SAWS program obviously did not preclude the issuance of the '314 and the '290 patents, these revelations only served to confirm Plaintiffs' suspicions and concerns about the USPTO leadership's pervasive structural bias and secret internal policies favoring large industry players . . ., and its corresponding animus towards independent inventors like Plaintiffs." (Id. ¶ 65.)

4

Mr. Hoyle next alleges further facts that he claims he became aware of through Mr. Ron D. Katznelson's paper in draft form, *The Pecuniary Interests of PTAB Judges: Empirical Analysis Relating Bonus Awards to Decisions in AIA Trials*. (Id. ¶ 69.) The report "identified a recruitment brochure published by the USPTO . . . which advertised the availability of 'gain-sharing bonuses' as a benefit available to PTAB judges—thereby suggesting that APJs would receive a share in the revenues that they generated for the agency by instituting IPR proceedings." (Id. ¶ 70.) "The Katznelson Report also revealed—based upon documents obtained through FOIA requests—the existence of a secret internal review committee within the PTAB called the AIA Review Committee ('ARC'), which was apparently responsible for reviewing certain final written decision drafts prior to their issuance, and providing suggestive guidance and/or edits on such decisions." (Id. ¶ 71.) "[S]ince the identity of persons serving on this secret extra-panel review committee was never revealed, Plaintiffs were ultimately deprived of their right to know who else might have contributed, influenced, or made the ultimate decision in B.E. Technology's IPR proceedings—or whether those persons . . . [had] clear conflicts-of-interest." (Id.)

Plaintiffs contend that these facts, taken together, "amount to a particularly clear and egregious violation of Plaintiffs' rights and leave no room for debate as to the unconstitutionality of those proceedings." (Id. ¶ 74.) Plaintiffs contend that each of the named Defendants "was either individually responsible for, involved in, or otherwise complicit in the actions that resulted in the violation of Plaintiffs' constitutional rights." (Id. ¶ 75.)

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted." A Rule 12(b)(6) motion permits the "defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged

5

in the complaint is true." Mayer v. Mylod, 988 F.2d 635, 638 (6th Cir. 1993) (citing Nishiyama v. Dickson Cty., 814 F.2d 277, 279 (6th Cir. 1987)).  A motion to dismiss only tests whether the plaintiff has pled a cognizable claim and allows the court to dismiss meritless cases which would waste judicial resources and result in unnecessary discovery.  Brown v. City of Memphis, 440 F. Supp. 2d 868, 872 (W.D. Tenn. 2006).

When evaluating a motion to dismiss for failure to state a claim, the Court must determine whether the complaint alleges "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  If a court decides that the claim is not plausible, the case may be dismissed at the pleading stage.  Id. at 679.  "[A] formulaic recitation of the elements of a cause of action will not do."  Twombly, 550 U.S. at 555.  The "[f]actual allegations must be enough to raise a right to relief above [a] speculative level."  Ass'n of Cleveland Fire Fighters v. City of Cleveland, 502 F.3d 545, 548 (6th Cir. 2007) (quoting Twombly, 550 U.S. at 555).  A claim is plausible on its face if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).  A complaint need not contain detailed factual allegations. Twombly, 550 U.S. at 570.  A plaintiff without facts who is "armed with nothing more than conclusions," however, cannot "unlock the doors of discovery."  Iqbal, 556 U.S. at 678–79; Green v. Mut. of Omaha Ins. Co., No. 10-2487, 2011 WL 112735, at *3 (W.D. Tenn. Jan. 13, 2011), aff'd, 481 F. App'x 252 (6th Cir. 2012).

Assessing the facial sufficiency of a complaint ordinarily must be undertaken without resorting to matters outside the pleadings.  Wysocki v. Int'l Bus. Mach. Corp., 607 F.3d 1102, 1104 (6th Cir. 2010).  "[D]ocuments attached to the pleadings become part of the pleadings and

may be considered on a motion to dismiss." Commercial Money Ctr., Inc. v. Illinois Union Ins. Co., 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c)); see also Koubriti v. Convertino, 593 F.3d 459, 463 n.1 (6th Cir. 2010). Even if a document is not attached to a complaint or answer, "when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." Commercial Money Ctr., 508 F.3d at 335–36. When evaluating a motion to dismiss, the Court may also take judicial notice of pertinent matters of public record, including bankruptcy filings. Signature Combs, Inc. v. United States, 253 F. Supp. 2d 1028, 1040 n.5 (W.D. Tenn. 2003).

### III.   ANALYSIS

####   A.   *Plaintiffs Have Failed to State a Plausible Bivens Cause of Action.*

In Bivens, the Supreme Court held that "it would enforce a damages remedy to compensate persons injured by federal officers who violated the prohibition against unreasonable search and seizures." Ziglar v. Abbasi, 137 S. Ct. 1843, 1854 (2017) (citing Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388, 397 (1971)). Since then, the Supreme Court has recognized two other constitutional violations that have an implied cause of action like in Bivens:

> In Davis v. Passman, 442 U.S. 288, 99 S. Ct. 2264, 60 L.Ed.2d 846 (1979), an administrative assistant sued a Congressman for firing her because she was a woman. The Court held that the Fifth Amendment Due Process Clause gave her a damages remedy for gender discrimination. Id. at 248–49, 99 S. Ct. 2264. And in Carlson v. Green, 446 U.S. 14, 100 S. Ct. 1468, 64 L.Ed.2d 15 (1980), a prisoner's estate sued federal jailers for failing to treat the prisoner's asthma. The Court held that the Eighth Amendment Cruel and Unusual Punishments Clause gave him a damages remedy for failure to provide adequate medical treatment. See id. at 19, 100 S. Ct. 1468. These three cases—Bivens, Davis, and Carlson—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself.

Ziglar, 137 S. Ct. at 1854–55.

Since these three cases, the Supreme Court "has made clear that expanding the <u>Bivens</u> remedy is now a 'disfavored' judicial activity" and has refused to extend <u>Bivens</u> to any new context "for the past 30 years." <u>Id.</u> at 1857. The Supreme Court has held that the following is the proper test for determining whether a case presents a new context for <u>Bivens</u>:

> If the case is different in a meaningful way from previous <u>Bivens</u> cases decided by this Court, then the context is new. Without endeavoring to create an exhaustive list of differences that are meaningful enough to make a given context a new one, some examples might prove instructive. A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous <u>Bivens</u> cases did not consider.

<u>Id.</u> at 1859–60.

"[I]f a claim arises in a new context, a <u>Bivens</u> remedy is unavailable if there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress 'to weigh the costs and benefits of allowing a damages action to proceed.'" <u>Egbert v. Boule</u>, 142 S. Ct. 1793, 1803 (2022) (quoting <u>Ziglar</u>, 137 S. Ct. at 1858). While the Supreme Court "has not defined the phrase 'special factors counselling hesitation' . . ., the inquiry must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." <u>Ziglar</u>, 137 S. Ct. at 1857–58. The following are examples of what might "cause a court to hesitate" in extending <u>Bivens</u>:

> It is not necessarily a judicial function to establish whole categories of cases in which federal officers must defend against personal liability claims in the complex sphere of litigation, with all of its burdens on some and benefits to others. It is true that, if equitable remedies prove insufficient, a damages remedy might be necessary to redress past harm and deter future violations. Yet the decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide. Those matters include the burdens on Government employees who

> are sued personally, as well as the projected costs and consequences to the Government itself when the tort and monetary liability mechanisms of the legal system are used to bring about the proper formulation and implementation of public policies. These and other considerations may make it less probable that Congress would want the Judiciary to entertain a damages suit in a given case.
>
> Sometimes there will be doubt because the case arises in a context in which Congress has designed its regulatory authority in a guarded way, making it less likely that Congress would want the Judiciary to interfere. . . . And sometimes there will be doubt because some other feature of a case—difficult to predict in advance—causes a court to pause before acting without express congressional authorization. In sum, if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts must refrain from creating the remedy in order to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III.

Id. at 1858. "Finally, our cases hold that that a court may not fashion a Bivens remedy if Congress already has provided, or has authorized the Executive to provide, 'an alternative remedial structure,'" and "[i]f there are alternative remedial structures in place, 'that alone,' like any special factor, is reason enough to 'limit the power of the Judiciary to infer a new Bivens cause of action.'" Egbert, 142 S. Ct. at 1804 (quoting Ziglar, 137 S. Ct. at 1858).

Here, Defendants contend that Plaintiffs' Complaint should be dismissed because Plaintiffs "seek an improper extension of Bivens to this context." (ECF No. 19 at PageID 112.) First, Defendants contend that this is a new context because "Plaintiffs' sweeping challenge to the IPR system involves higher-ranking defendants in adjudicative positions, distinct patent-related legal mandates, and claims of greater generality than those implicated by Bivens's law enforcement search-and-seizure context, Carlson's prison medical care context, and Davis's workplace sex discrimination context." (Id. at PageID 114.)

Defendants contend that, at the next step in the analysis, there are special factors counseling hesitation because "Plaintiffs' claims . . . plainly challenge high-level governmental policy-

9

making." (Id. at PageID 115.) Additionally, Defendants contend that, "because plaintiffs assert that defendants had improper motives for implementing the contested policies and speculate about each official's role and intent in establishing them, . . . the litigation of their claims would require unacceptably burdensome inquiries into sensitive government deliberations about those policies and officials' motives for creating them." (Id.) Defendants assert that "[a]nother special factor is Congress's silence on a damages remedy in light of its intense interest in patent rights and regulation." (Id.) Defendants contend that "[d]espite its sustained attention to patent holders' constitutional rights, other stakeholders' interests, and the public interest, Congress did not provide patent holders with a damages remedy for due process violations in the IPR process." (Id. at PageID 116.) Finally, Defendants contend that "there should be no Bivens remedy here because there are alternative means available to protect the due process interests underlying plaintiffs' claims," such as "appealing to the Federal Circuit," "su[ing] for an injunction against those policies", and potentially "su[ing] the government for damages under the Federal Tort Claims Act ('FTCA') based on USPTO officials' tortious deprivation of the patent holder's property in the IPR process." (Id. at PageID 117.)

In response, Plaintiffs contend that they "have quite clearly alleged that Defendants' conduct deprived them of a 'constitutionally protected' property interest without due process of law." (ECF No. 22 at PageID 435.) Plaintiffs assert that "Defendants' contention that this case seeks an improper extension of Bivens ignores well-established historical precedent, in a long line of cases, recognizing the availability of an implied constitutional cause of action under Bivens for claims arising under the Due Process Clause of the Fifth Amendment." (Id. at PageID 439.) Plaintiffs contend that Davis stands for the proposition that if a Bivens cause of action is brought under the Fifth Amendment, it is not a new context. (Id.) Plaintiffs further contend that, unlike in

10

Schweiker v. Chilicky, where the Supreme Court declined to extend Bivens to a procedural due process violation for disability benefits because the Social Security Act "provided an adequate mechanism for redress," the Plaintiffs here "ha[d] no alternative remedy for seeking redress." (Id. at PageID 439–40.) (citing Schweiker, 487 U.S. 412 (1998).) Plaintiffs then summarize other due process Bivens cases which were ultimately dismissed because the plaintiffs in those cases had access to other avenues to seek relief. (Id. at PageID 442–43.) (summarizing Left Fork Min. Co., Inc. v. Hooker, 775 F.3d 768 (6th Cir. 2014); Haines v. Fed. Motor Carrier Safety Admin., 814 F.3d 417 (6th Cir. 2016).) Plaintiffs contend that their appeal to the Federal Circuit was not a separate avenue to seek relief because they did not know about these alleged due process violations at the time and thus, "Plaintiffs were deprived of any opportunity to raise these issues and their constitutional implications in their appeal to the Federal Circuit." (Id. at PageID 444.) Finally, Plaintiffs contend that there are not any special factors counseling hesitation in the event that the Court finds that this is a new context for Bivens. (Id. at PageID 445–46.)

In reply, Defendants contend that Plaintiffs are sidestepping Ziglar by "ask[ing] this Court to follow the discarded analysis of the Supreme Court's early Bivens decisions." (ECF No. 23 at PageID 468.) Defendants also dispute Plaintiffs' contention that there are no special factors here. Defendants contend that even "outside the national security context, the courts have also concluded that the possibility of intrusive discovery into high-ranking officials' deliberations counsels hesitation in implying a Bivens remedy." (Id. at PageID 472.) (citing Greenlaw v. Klimek, No. 4:20-CV-311-SDJ, 2021 WL 6112784 (E.D. Tex. Dec. 27, 2021); Canada v. U.S. Internal Revenue Serv., No. 3:17-cv-2465-S-BN, 2018 WL 4732467 (N.D. Tex. June 21, 2018); Jackson v. U.S. Postal Serv., No. 4:18CV500 RLW, 2019 WL 1331636 (E.D. Mo. Mar. 25, 2019).)

Despite Plaintiffs' contentions, this suit would be a new context for Bivens because of the meaningful differences between this case and the three Supreme Court-recognized Bivens actions. For example, under Bivens, Carlson, and Davis, the statutory and regulatory regimes for patent protection were not implicated, nor were high-ranking officers of the USPTO involved in any of those actions. See Ziglar, 137 S. Ct at 1859 ("If the case is different in a meaningful way from previous Bivens cases decided by this Court, then the context is new.").

Because this is a new context, the Court must determine whether there are any special factors counseling hesitation. Id. at 1857. As pointed out by Defendants, Congress has enacted considerable statutory and regulatory authority in the area of patent law, which would indicate that "there are sound reasons to think Congress might doubt the efficacy or necessity of a[n additional] damages remedy as part of the system for enforcing the law and correcting a wrong." Id. at 1858. Congress has legislated monetary remedies and injunctive relief for patent infringement and has legislated avenues to challenge the validity of patents, so it follows that Congress would have implemented a remedy for unconstitutional takings of patents as well if it had so desired. Further, Plaintiffs' allegations implicate the conduct of high-level officers implementing the PTAB's policies. See id. at 1860 ("Even if the action is confined to the conduct of a particular Executive Officer in a discrete instance, these claims would call into question the formulation and implementation of a general policy.") These special factors alone would disfavor extending Bivens to this context.

Perhaps most importantly, however, is the fact that Plaintiffs had an alternative remedy to correct the due process violation. See id. at 1858 ("[I]f there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new Bivens cause of action."). Here, Plaintiffs appealed the PTAB decisions to the Federal Circuit, and the

Federal Circuit affirmed the PTAB's findings that both patents were invalid. (ECF No. 1 ¶ 37.) While Plaintiffs contend that they were unable to raise these specific due process arguments in that appeal because they did not know these factual allegations at the time, Plaintiffs were still able to appeal the taking, and the appeal alone provided procedural protection against an unconstitutional taking. Even taking Plaintiffs' factual allegations as true, it cannot be disputed that the Federal Circuit has already reviewed these PTAB decisions invalidating the two patents and found them "supported by substantial evidence." See B.E. Tech., L.L.C. v. Sony Mobile Commc'ns (USA) Inc., 657 F. App'x 982, 990 (Fed. Cir. 2016); B.E. Tech., L.L.C. v. Google, Inc., No. 2015-1827, 2016 WL 6803057, at *8 (Fed. Cir. Nov. 17, 2016). Because PTAB decisions can be appealed to the Federal Circuit, any improper bias or abuse by PTAB officials can be guarded against by the judicial branch, thus ensuring that the PTAB panels' reasoning is sound and making a Bivens suit for invalidated patents unnecessary. Therefore, Defendants' Motion to Dismiss is **GRANTED**, Plaintiffs having failed to state a plausible Bivens claim.

      B.     *Defendants' Other Arguments are Moot.*

Defendants also move to dismiss for lack of standing, for lack of personal jurisdiction, because the claims are time-barred, and on the basis that all Defendants had either absolute immunity or qualified immunity. (See ECF No. 19 at PageID 107–12, 118–33.) Because Plaintiffs fail to state a Bivens claim as a matter of law, however, these contentions need not be addressed on the merits and are **MOOT**.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss is **GRANTED**.

**SO ORDERED**, this 19th day of September, 2022.

                                               s/ Jon P. McCalla
                                               JON P. McCALLA
                                               UNITED STATES DISTRICT JUDGE